Randall E. STOWELL, Respondent,

v.

CLOQUET CO–OP CREDIT
UNION, Appellant,

v.

Robert NELSON, Third–Party Defendant.

No. C4–95–1608.

Court of Appeals of Minnesota.

Jan. 30, 1996.

Review Granted April 1, 1996.

Robert H. Magie, III, Crasweller, Magie, Andresen, Haag & Paciotti, Duluth, for Respondent.

William R. Joyce and James J. Hartnett, IV, Faegre & Benson, Minneapolis, for Appellant.

Considered and decided by SCHUMACHER, P.J., TOUSSAINT, C.J., and HUSPENI, J.

## OPINION

HUSPENI, Judge.

Respondent, an account holder at appellant Credit Union, brought this action to recover amounts that the Credit Union paid over several months on forged checks drawn on his account. Prior to trial, the Credit Union moved for summary judgment, on the ground that respondent's alleged noncompliance with either a 20–day notice provision in a draft withdrawal agreement or a 30–day provision under the Uniform Commercial Code should bar the action. The district court denied the motion, and the case proceeded to trial. On a special verdict form, the jury found that the Credit Union had exercised its duty of care with respect to respondent's account for all but one of the ten months in question, while respondent had exercised his duty of care for only the first four months.

The Credit Union now appeals from the judgment entered following the trial court's denial of the Credit Union's motions for a new trial or for judgment notwithstanding the verdict. We affirm.

## FACTS

Respondent Randall Stowell opened a savings account and a share draft (checking) account at appellant Cloquet Co-op Credit Union (Credit Union) in 1984. At that time, Stowell signed a draft withdrawal agreement, which provided in part that

> [i]f items on the statements are not objected to within twenty (20) days from the mailing date of the statement, the accuracy of the items on the statement shall be considered final.

After opening the accounts, Stowell received his account statements from the Credit Union on a monthly basis without incident until December 1992. The Credit Union mails statements for a given month to its 30,000 members within the first ten days of the following month. The Credit Union mailed Stowell's statements to his address in rural Barnum. Stowell's home is separated

by approximately one-half of a mile from his mailbox, which stands next to the mailbox of the owners of the neighboring property. Robert Nelson moved onto the neighboring property in the early fall of 1992.

In December 1992, Stowell noticed that he had not received his account statement from the Credit Union for transactions he had made in the previous month. He informed an employee at the Credit Union that he had not received the statement. The employee told Stowell that the computers were down at that time, but that the Credit Union would mail a second statement to him later. Stowell never received a second statement. Over the course of the next several months, as Stowell noticed that his account statements failed to arrive, he periodically contacted the Credit Union. He spoke with different employees at different times. Generally, each employee would respond that he or she would send out a second mailing. Stowell never received the second mailings.

Apart from his contacts with the Credit Union regarding his account statement mailings, Stowell also visited the Credit Union approximately twenty times between the months of December 1992 and August 1993 to complete various transactions. Most of those transactions involved Stowell's savings account. Stowell generally kept a zero balance in his share draft account; the Credit Union covered Stowell's checks by transferring money from his savings account. With each in-person transaction that Stowell made, the Credit Union would issue him a receipt that indicated the change in his account from the transaction. Because the transactions generally involved only Stowell's savings account, the receipts usually reflected the balance in that account alone and not in his checking account.

In August 1993, Stowell called the Credit Union and spoke to Terry Kimber, the vice president of loans and a long-time Credit Union employee. Stowell told Kimber that he had been missing some of his mail and that all of the missing mail seemed to be his statements from the Credit Union. Kimber testified that he mailed Stowell duplicate statements for two or three prior months and that he told Stowell to contact the Credit Union within three days if the duplicates did not arrive. Kimber admitted that he never suggested that Stowell should pick up the statements in person rather than wait to receive them in the mail. Stowell did not receive the duplicate statements, and he did not contact Kimber within the three-day period.

On September 15, 1993, Stowell received a telephone call from a local bank about a bounced check drawn on Stowell's account and written out to Robert Nelson, Stowell's neighbor. Aware that he had never written a check to Nelson, Stowell realized that something was amiss, and he immediately contacted the police and the Credit Union. Until that day, Stowell had never suspected his neighbor of forgery. On searching Nelson's property on September 17, 1993, the police discovered various pieces of mail addressed to Stowell from the Credit Union, including an account statement for December 1992. Nelson has since been convicted of forgery-related criminal charges.

Stowell and the Credit Union eventually determined that, starting on November 13, 1992, Nelson had forged Stowell's signature on approximately 50 checks, totalling $22,-239.34. Stowell brought this action after the Credit Union refused to reimburse him for that amount. Acting consistent with a special verdict, the trial court awarded Stowell judgment of $12,366.27, plus $635.70 in interest.

### ISSUES

1. Did the trial court err in ruling that a 20–day notice provision, in a draft withdrawal agreement that respondent signed, was "manifestly unreasonable" within the meaning of Minn.Stat. § 336.4–103(a) and therefore not enforceable?

2. Did the trial court err by concluding that Minn.Stat. § 336.4–406(d)(2) did not bar Stowell's recovery for amounts paid for fraudulent checks written by a single forger more than thirty days after the Credit Union mailed to Stowell's address an account statement listing unauthorized checks written by the same forger?

3. Did the trial court abuse its discretion by not reading to the jury the text of Minn. Stat. § 336.4–406(d) and by not instructing the jury that Stowell's account statements were made available to him upon mailing?

4. Was the jury's finding that the Credit Union failed to exercise ordinary care by negotiating checks forged in August 1993 contrary to the evidence presented at trial?

## ANALYSIS

### I. Draft Withdrawal Agreement

The Credit Union first argues that Stowell's action must fail because he did not comply with the 20–day notice provision of the draft withdrawal agreement. That provision requires the account holder to notify the Credit Union of any errors in his account statements "within twenty (20) days from the mailing of the statement."

■ The trial court rejected this argument when the Credit Union raised it as part of its motion for summary judgment and again as part of its motion for a new trial. The trial court found that the provision was "manifestly unreasonable" within the meaning of Minn. Stat. § 336.4–103(a) (1994), a provision of the Uniform Commercial Code that addresses when parties may use such an agreement to limit a bank's responsibilities to its clients. The Credit Union's appeal from this determination raises a question of law, which the reviewing court may determine without deference to the district court. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984).

### A. *Brunswick*

The Credit Union asserts that *Brunswick Corp. v. Northwestern Nat'l Bank & Trust Co.*, 214 Minn. 370, 8 N.W.2d 333 (1943), controls our interpretation of the 20–day notice requirement at issue in this case. We disagree and find the Credit Union's reliance on *Brunswick* to be misplaced because that case is both factually and legally distinguishable. In *Brunswick*, the court upheld as "reasonable under the circumstances" a provision in a passbook that required a corporate account holder to examine account statements within ten days of receipt. *Id.* at 375,

8 N.W.2d at 336. Because the corporation's auditor picked up the account statements at the bank, *id.* at 375, 8 N.W.2d at 336, the court did not explicitly examine an additional provision in the passbook, which required examination "within fifteen days from the date of mailing." *Id.* at 372, 8 N.W.2d at 334. Instead, the court relied solely on the 10–day provision and reasoned:

[I]t is necessary only that enforcement of [provisions] be reasonable under the circumstances. In the instant case, plaintiff's employee customarily went to the bank the first of each month and received the bank statements and cancelled checks. He was charged with the duty of checking them over and discovering whether the bank's statements were correct. He made out daily reports and monthly reports which he turned over to plaintiff's active officers. There is no contention that he did not have ample time and abundant opportunity to check for and discover errors within the ten-day period provided.

*Brunswick*, 214 Minn. at 375–76, 8 N.W.2d at 336.

Further, since the supreme court's decision in the *Brunswick* case, the Minnesota Legislature has adopted the Uniform Commercial Code (U.C.C.), Minn.Stat. §§ 336.1–101 to 336.11–108 (1994). Because of the enactment of the U.C.C., the *Brunswick* case has been eroded and provides scant support for upholding the 20–day notice provision at issue here.

### B. The Uniform Commercial Code

The U.C.C. allows parties to enter into agreements that use standards different from those under the U.C.C. to assess a bank's responsibility, provided that "those standards are not manifestly unreasonable." Minn.Stat. § 336.4–103(a). We conclude, as did the trial court, that the standards of the draft withdrawal agreement here are "manifestly unreasonable."

■ We note, first, that the 20–day notice requirement in the draft withdrawal agreement directly conflicts with the period set forth in Minn.Stat. § 336.4–406, which provides in relevant part:

(c) If a bank sends or makes available a statement of account or items * * * the customer must exercise reasonable promptness in examining the statement or the items * * *. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

(d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection (c), the customer is precluded from asserting against the bank:

* * * *

(2) the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

Minn.Stat. § 336.4–406(c), (d)(2).

■ While section 366.4–406(d)(2) measures a 30–day period in terms of the time in which an account holder is able to examine his statements, the draft withdrawal agreement measures a 20–day period from the date of mailing. The agreement alters the statutory standards not only by reducing the applicable time period from thirty days to twenty days, more importantly, it commences the running of that period not from the time the account holder has an opportunity to examine the statement, but from the time the institution mails the statement to the account holder. The words of the statute are clear, and we must give effect to those words. "Examine" means to observe carefully or critically. *The American Heritage Dictionary* 637 (3d ed. 1992).

As the trial court observed, enforcement of this draft withdrawal agreement would potentially lead to various untenable scenarios. Under the draft withdrawal agreement, if an account holder left home on vacation on the day that the Credit Union mailed his account statement and returned home three weeks later to find the account statement filled with errors, he would have no means of holding the Credit Union accountable for any of the mistakes.

While the statute permits the parties to "determine by agreement the standards by which the bank's responsibility is to be measured,"[1] Minn.Stat. § 336.4–103(a), such determination must not result in standards that are "manifestly unreasonable." *Id.* The trial court did not err here in finding that 20 days from mailing was manifestly unreasonable.

## II. Statutory 30–day Provision

■ The Credit Union argues that if Minn.Stat. § 336.4–406(d)(2), rather than the draft withdrawal agreement, governs this case, then the 30–day notice provision of that statute should bar Stowell's recovery for checks drawn on his account after January 10, 1993. After that date, more than thirty days would have elapsed from the day that the Credit Union mailed to Stowell's address the first account statement listing checks forged by Nelson. The trial court denied the pretrial and posttrial motions in which the

1. The Credit Union argues that we adopt the reasoning of New York courts that have upheld the validity of notice provisions in bank agreements on a "condition precedent" theory. *See, e.g., Parent Teacher Ass'n, Pub. Sch. 72 v. Manufacturers Hanover Trust Co.,* 138 Misc.2d 289, 524 N.Y.S.2d 336 (Civ.Ct.1988) (granting summary judgment for bank where account holder's treasurer failed to comply with contractual duty to notify bank within 14 days of mailing); *J. Sussman, Inc. v. Manufacturers Hanover Trust Co.,* 2 U.C.C. Rep.Serv.2d 1605 (N.Y.Sup.Ct. 1986) (granting summary judgment for bank where no notice within 14 days of mailing).

The New York cases turn on the interpretation of language contained in the New York counterpart to Minn.Stat. § 336.4–406(d)(2). *See* N.Y.U.C.C.Law § 4–406(2)(b) (McKinney 1991). Unlike the Minnesota provision, the New York statute does not frame the applicable time period in terms of giving an account holder time to "examine" the account statement. Rather, it limits recovery when the account statement "was available to the customer for a reasonable period not exceeding fourteen calendar days." *Id.* Because of this difference in the statutory language, we are not persuaded by the New York line of cases.

Credit Union raised this issue. The Credit Union's appeal with respect to the construction of Minn.Stat. § 336.4–406(d)(2) involves a question of law, which this court may review independently of the district court. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn. 1985).

██ The introductory language of the statute indicates that the 30–day limitation applies

> [i]f the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection (c) [of Minn.Stat. § 336.4–406] * * *.

Minn.Stat. § 336.4–406(d). The duties under subsection (c) require an account holder to "exercise reasonable promptness in examining the statement * * * to determine whether any payment was not authorized." Minn. Stat. § 336.4–406(c). The issue of whether Stowell exercised reasonable promptness was a disputed question of fact. Only at trial did the Credit Union prove when Stowell neglected his duties.[2] The trial court, therefore, properly concluded that it could not rule as a matter of law that the 30–day limitation barred recovery for checks drawn after January 10, 1993.

## III. Jury Instructions

██ The Credit Union next challenges the trial court's rejection of two proposed jury instructions. Generally, "[a] refusal to give a requested jury instruction lies within the discretion of the trial court." *State v. Daniels*, 361 N.W.2d 819, 831 (Minn.1985). The reviewing court need not grant a new trial if the trial court's instructions fairly and correctly state the applicable law. *Alevizos v. Metropolitan Airports Comm'n*, 452 N.W.2d 492, 501 (Minn.App.1990), *review denied* (Minn. May 11, 1990).

2. The following special verdict questions were asked for each of the months December 1992–September 1993:

> a. During this month should [Stowell] have reasonably discovered the unauthorized payments and promptly notified the credit union of the forgeries?

### A. Minn.Stat. § 336.4–406(d)

The Credit Union contends that, even if Minn.Stat. § 336.4–406(d) does not bar any of Stowell's claims as a matter of law, the court nevertheless should have read the text of the statute to the jury.

██ The special verdict questions pertaining to Stowell's conduct required the jury to determine, for each month from December 1992 to September 1993, whether Stowell should "have reasonably discovered the unauthorized payments and promptly notified the credit union of the forgeries." Thus, the questions asked the jury to identify the months in which Stowell fulfilled his duties as an account holder. The U.C.C. defines those duties under Minn.Stat. § 336.4–406(c), without referring to a 30–day period as a particular limitation. The provisions of Minn.Stat. § 336.4–406(d), as the trial court explained, do not further define an account holder's duties. Rather, subsection (d) may take effect only after the finder of fact has determined whether the account holder breached his duties. Consequently, even without reading to the jury the text of Minn.Stat. § 336.4–406(d), the trial court adequately instructed the jury on the law applicable to the questions they were to answer regarding whether Stowell had performed his duties.

### B. Sending Statements by Depositing Them in Mail

The Credit Union also argues that the trial court should have instructed the jury that, under the U.C.C., the Credit Union made Stowell's account statements available to him when it deposited them in the mail.

The special verdict form required the jury to determine, for each month in question, whether Stowell exercised reasonable promptness. In its instructions to the jury, the trial court clarified the meaning of "reasonable promptness," by stating that

> b. Did [the Credit Union] fail to exercise ordinary care in paying the items and did that failure substantially contribute to the loss?

The jury responded "no" to both (a) and (b) for the months December 1992–March 1993; "yes" to (a) and "no" to (b) for April 1993–July 1993; "yes" to both (a) and (b) for August 1993; and "yes" to (a) and "no" to (b) for September 1993.

reasonable promptness requires the customer to notify the credit union of unauthorized signatures on drafts within the period of time that the customer reasonably should have discovered the unauthorized signatures. Reasonable promptness is determined on a case-by-case basis.

The U.C.C. provision discussing "reasonable promptness" begins with the words, "If a bank sends or makes available a statement of account * * *." Minn.Stat. § 336.4–406(c). "Send" is defined as "to deposit in the mail," under Minn.Stat. § 336.1–201(38). Therefore, the Credit Union argues, the trial court should have instructed the jury as to the U.C.C.'s definition of "to send."

The parties do not dispute whether or when the Credit Union mailed the account statements to Stowell's address. The parties presented evidence to inform the jury that the Credit Union mailed the account statements to its members on a monthly basis. Even without a jury instruction defining "sends" as "deposits in mail," the jury likely considered that Stowell knew that he ought to receive statements each month.

The jury ultimately found that Stowell should have reasonably discovered and promptly notified the Credit Union of the unauthorized payments by April 1993. Thus, the jury found that Stowell failed to exercise reasonable promptness in examining his account statements after that date, even though he did not actually receive any statements listing forgeries until September 1993. The jury's responses to the special verdict questions indicate that the trial court's instructions did not mislead the jury as to the meaning of the law. Because the jury instructions were sufficiently broad to encompass the essential meaning of the arguably applicable provisions that the Credit Union wanted read to the jury, we find no abuse of the trial court's discretion.

### IV. Special Verdict for August 1993

As its final claim of error, the Credit Union asserts that the trial court should have granted the motion for a new trial, because the special verdict, finding that the Credit Union failed to exercise ordinary care in August 1993, was not supported by the evidence.

"On appeal from a denial of a motion for a new trial, the verdict must stand unless it is manifestly and palpably contrary to the evidence, viewed in a light most favorable to the verdict." *ZumBerge v. Northern States Power Co.,* 481 N.W.2d 103, 110 (Minn.App.1992), *review denied* (Minn. Apr. 29, 1992). "If the jury's special verdict finding can be reconciled on any theory, the verdict will not be disturbed." *Hanks v. Hubbard Broadcasting,* 493 N.W.2d 302, 309 (Minn.App.1992), *review denied* (Minn. Feb. 12, 1993).

For every month but August 1993, the jury found that the Credit Union acted in good faith. The Credit Union acknowledges that in August Stowell contacted Terry Kimber, a vice president of the Credit Union, and informed him that he had not received several Credit Union statements, although he had no problems with most of his other mail. Kimber did not suggest that Stowell come and review his statements at the Credit Union; rather, Kimber sent out at least two or three duplicate statements to Stowell in the mail. Kimber advised Stowell to call him within three days if the statements had not arrived, and Stowell failed to do so. But neither did Kimber call Stowell to confirm whether the statements had arrived.

In denying the Credit Union's motion for judgment notwithstanding the verdict, the trial court stated several bases upon which the jury could have found that, in August 1993, the Credit Union failed to exercise ordinary care. By that month, Stowell had made several calls to various Credit Union employees about his non-receipt of account statements in the mail. His call to Kimber was more than simply one additional call; it was a call in which Stowell clearly conveyed that he had not received his account statements for at least a few months. These compounded events provided sufficient evidence for the jury to have found that the Credit Union did not act with ordinary care in August 1993.

### DECISION

The trial court properly concluded that the 20–day notice provision in the draft with-

drawal agreement was "manifestly unreasonable" within the meaning of Minn.Stat. § 336.4–103(a) and therefore not enforceable. The trial court also correctly ruled that under Minn.Stat. § 336.4–406(d)(2) respondent could pursue his claims for periods in which the Credit Union had not proved that he had failed to comply with his duties as an account holder. The trial court did not abuse its discretion by not instructing the jury that Minn.Stat. § 336.4–406(d) applied or that respondent's account statements were made available to him upon mailing. The jury's special verdict, finding that the Credit Union failed to exercise ordinary care in negotiating checks forged in August 1993, was not contrary to the evidence presented at trial.

**Affirmed.**