Randall E. STOWELL, Respondent,

v.

CLOQUET CO–OP CREDIT UNION, Appellant,

v.

Robert NELSON, Third–Party Defendant.

No. C4–95–1608.

Supreme Court of Minnesota.

Jan. 16, 1997.

Faegre & Benson, James J. Hartnett, IV, William R. Joyce, Minneapolis, for appellant.

Crassweller, Magie, Andrew, Haag & Paciotti, Robert H. Magie, III, Duluth, for respondent.

## OPINION

STRINGER, Justice.

Plaintiff/respondent Randall Stowell ("Stowell") brought this action in Carlton County District Court seeking to recover approximately $22,000 that had been paid by the defendant/appellant Cloquet Co-op Credit Union ("Credit Union") over a ten-month period on checks forged on Stowell's account by Stowell's neighbor. The district court held that a Draft Withdrawal Agreement requiring Stowell to notify the Credit Union of any errors in his account statement within twenty days of the mailing of the statement was manifestly unreasonable and refused to apply the agreement to bar Stowell's claim. After a two-day trial, the district court jury found the Credit Union liable for forged checks in the first four months of the scheme, Stowell responsible for forgeries in five of the next six months, and both parties responsible for the forgeries in the remaining month. The court of appeals affirmed in all respects. We reverse, concluding that the Draft Withdrawal Agreement was not manifestly unreasonable and should be enforced in the absence of proof of a lack of ordinary care by the Credit Union in paying the forged items. Further, because we conclude that the plaintiff presented no evidence establishing that the Credit Union failed to meet the statutory definition of ordinary care in paying the forged items in August 1993, we reverse the district court's holding that Stowell is entitled to recover seventy-five percent of his losses for that month.

The record indicates that the Credit Union uses an automated check processing system which reads the magnetically coded numbers printed across the bottom of each check. This system is used throughout the Federal Reserve System and by all banks and credit unions in the state of Minnesota. Because the Credit Union processes approximately one million transactions each day, it does not

manually check individual signatures against signature cards to detect potential forgeries. Rather, the Credit Union provides its members with monthly account statements itemizing the transactions occurring in the previous calendar month, including the date of the transaction, the check number, the amount of the transaction, and the account balance before and after each transaction. Consistent with industry-wide practice, the Credit Union relies on the account holders to examine the statement each month and contact the Credit Union if they identify any unauthorized checks.

Stowell opened a savings account and a draft account at the Credit Union on May 29, 1984. In connection with the opening of the draft account, Stowell signed a "Draft Withdrawal Agreement" which contained the following provision:

> The statements of the Draft Account shall be the only official record of the transactions on this account. If items on the statements are not objected to within twenty (20) days from the mailing date of the statement, the accuracy of the items on the statement shall be considered final.

Stowell is a sophisticated businessman. Prior to signing the agreement, he read it, understood its terms, and recognized that he had a responsibility to review his account statements and notify the Credit Union of any errors. For the next eight years after opening the account, Stowell used the draft account for both personal and business purposes and maintained a running balance of his deposits and withdrawals in his checkbook. At the beginning of each month Stowell would receive in the mail an account statement from the Credit Union which he checked against his own records on a monthly or bi-monthly basis.

In the fall of 1992, Robert Nelson moved into a cabin located on the same country road as Stowell's house. Nelson's mailbox was next to Stowell's and both boxes were located approximately one-half mile from Stowell's house. Soon after he moved in, Nelson stole a number of Stowell's checks and, from November 1992 to September 1993, forged Stowell's signature on fifty of the stolen checks and cashed them at various banks and businesses in the Barnum/Cloquet area. As a part of his fraudulent scheme, Nelson removed Stowell's Credit Union account statements out of Stowell's mail each month to prevent Stowell from discovering the forgeries.

In December 1992, Stowell realized that he had not received an account statement from the Credit Union for the previous month. After waiting a few more weeks for the statement to arrive, he informed an employee of the Credit Union's branch office that he had not received it. Although the Credit Union mailed a duplicate statement to Stowell's correct address, Stowell never received the duplicate either. In fact, due to Nelson's theft, Stowell did not receive any items of mail whatsoever from the Credit Union between December 1992 and September 1993.

During this period, Stowell periodically contacted the Credit Union and complained that his account statements had failed to arrive. On each occasion a Credit Union employee mailed Stowell duplicate statements. At no time did Stowell ask to have a statement printed as he waited or to look at copies of his canceled checks, nor did any Credit Union employee suggest such measures. Other than complaining that his statement had not arrived, Stowell did nothing to inform anyone at the Credit Union that he suspected anything was wrong with his draft account or his mail. Despite the fact that over $22,000 was eventually unlawfully withdrawn from his account by virtue of Nelson's forgeries, Stowell never expressed concern to any Credit Union employee regarding his diminishing account balance as disclosed in each transaction receipt.

In August 1993, Stowell called Credit Union vice president Terrance Kimber and informed him that he had not received any mail from the Credit Union for some time. Kimber replied that the Credit Union would again mail Stowell copies of his account statements and told him that he should contact the Credit Union if the statements did not arrive within a few days. Again, neither Stowell nor Kimber suggested taking further measures such as hand delivering to Stowell printed copies of the statement. Kimber mailed the statements to Stowell as promised

but again, Stowell never received them; Stowell apparently ignored Kimber's directive to contact him if the statements were not received and did not contact Kimber until several weeks later.

Nelson's forgery scheme was finally discovered on September 15, 1993, when Stowell received a telephone call from the Finlayson State Bank at Barnum informing him that a check he had written to Robert Nelson had bounced. Because he had never written any checks to Nelson, Stowell became suspicious and notified the police and the Credit Union. Upon reviewing Stowell's account statements, Stowell and the Credit Union discovered that between November 13, 1992 and September 15, 1993 Nelson had forged fifty checks on Stowell's account in the total amount of $22,329.34. Stowell acknowledged at trial that he could identify the forged checks from his account statements.

When the Credit Union refused to reimburse Stowell for the full amount of the forged checks, Stowell brought suit against the Credit Union in district court. The Credit Union's pretrial motion for summary judgment was denied by the district court, concluding that the clause in the Draft Withdrawal Agreement providing that objections to the account statement must be made within twenty days of the mailing of the statement was manifestly unreasonable as a matter of law because, in the district court's view, the Uniform Commercial Code ("UCC") requires that a reasonable time to examine a bank statement begins to run when the customer gains possession of the statement rather than when the bank mails it.

After two days of testimony, the jury found that from December 1992 through March 1993 the Credit Union acted with reasonable care in paying the forged checks, and that Stowell was also without fault in failing to discover the unauthorized payments. Therefore, based upon UCC rules 4–401(a) and 4–406(c)(d) placing liability for items paid over forged drawer's signatures on the bank, in the absence of a lack of reasonable promptness on the part of the account holder in examining his account statements and reporting the unauthorized

items, the court held that Stowell was entitled to recover from the Credit Union the amounts of the forged checks paid from November 1992 through March 1993. For the months of April through July 1993 and September 1993, the jury found that Stowell should reasonably have discovered the forgeries, and the court therefore held that the Credit Union was not liable for the forged checks paid during those months. Finally, as to August 1993, the jury found that both the Credit Union and Stowell failed to exercise ordinary care and apportioned the fault for the payment of the forged checks in that month seventy-five percent to the Credit Union and twenty-five percent to Stowell. On the basis of the special verdict, the court awarded Stowell a judgment of $12,266.27 plus $635.70 in interest.

On appeal, the court of appeals affirmed, holding that the 20–day provision of the Draft Withdrawal Agreement was manifestly unreasonable, that the issue of whether Stowell exercised reasonable promptness in examining his account statements was a disputed question of fact that was settled by the jury's determination that Stowell could not reasonably have discovered the forgeries until March 1993, and that the jury's finding that the Credit Union failed to exercise ordinary care in paying the August 1993 checks was adequately supported by the evidence.

▌ We first address the validity of the provision in the Draft Withdrawal Agreement, relating to Stowell's obligation to review and report inaccuracies in the monthly account statement. Under the Minnesota version of the UCC, an account holder is generally barred from recovering from the bank the value of a series of forged checks written on the account by a single forger if the account holder does not exercise "reasonable promptness" in examining his or her account statements and notifying the bank of any forged checks. Minn.Stat. § 336.4–406(c)(d) (1992). While the statute does not define "reasonable promptness," Minn.Stat. § 336.4–103(a) (1992) states:

The effect of the provisions of this article may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good

faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. *However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.*

(emphasis added). Here, the Draft Withdrawal Agreement signed by Stowell when he opened his accounts in effect defines the standard by which "reasonable promptness" will be measured by stating that "[i]f items on the statements are not objected to within twenty (20) days from the mailing date of the statement, the accuracy of the items on the statement shall be considered final." The issue then, is whether the provision requiring inspection of the statement within twenty days of mailing is manifestly unreasonable. Review is *de novo* because this issue involves the interpretation of Minn.Stat. § 336.4–103 and the construction of an unambiguous contract. *Hibbing Educ. Ass'n v. Pub. Employment Relations Bd.,* 369 N.W.2d 527, 529 (Minn.1985) ("[C]onstruction of a statute * * * is clearly a question of law"); *Trondson v. Janikula,* 458 N.W.2d 679, 681 (Minn. 1990) ("[C]onstruction and effect of a contract presents a question of law, unless an ambiguity exists.").

The district court held that the provision of the Draft Withdrawal Agreement that mailing triggered the period to examine the statement was manifestly unreasonable because it did not allow the account holder a reasonable opportunity to examine bank statements and discover forged checks. The court of appeals agreed and added an additional concern—that "[t]he agreement alters the statutory standards [of section 336.4–103(a) ] * * * by reducing the applicable time period from thirty days to twenty days * * *." *Stowell v. Cloquet Co-op Credit Union,* 542 N.W.2d 663 at 668 (Minn.App.1996).

■ Thus, our first concern in analyzing the validity of the Draft Withdrawal Agreement is whether Stowell's duty to inspect his account statements with reasonable promptness and notify the bank of any unauthorized checks could arise when the statements were mailed by the Credit Union, as the agreement provides, or can only be triggered by

receipt of the statements by Stowell, as the lower courts have held. Put another way, the question is who, as between an account holder and a bank, bears the risk that account statements will be lost or intercepted in the mail. Minn.Stat. § 336.4–406(c) provides guidance: "If a bank sends or makes available a statement of account or items pursuant to subsection (a), the customer must exercise reasonable promptness in examining the statement * * *." The term "send" is defined as follows:

"Send" in connection with any writing or notice means to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed * * *.

Minn.Stat. § 336.1–201(38) (1992). The Minnesota Commercial Code Comment on this definition states that the definition "is intended to clarify the distinction between the act of *transmitting* and its *receipt* * * * since some rules merely require that a writing be 'sent' while others require that it must be 'received.' " Minnesota Commercial Code Comment to Minn.Stat. § 336.1–201(38) (emphasis in original). The statutory language thus clearly indicates that the account holder's duty to inspect the account statements with reasonable promptness commences at the time the statements are mailed by the bank.

No Minnesota case has addressed the issue of when an account holder's duty to exercise reasonable promptness in examining account statements commences, but because one of the purposes of the UCC is to foster nationwide uniformity in the application of commercial law, Minn.Stat. § 336.1–102, cases from other jurisdictions interpreting the Code should be given substantial weight. *See* Minn.Stat. § 645.22 ("Laws uniform with those in other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them."). The modern UCC case law of other jurisdictions is virtually unanimous in holding that, once account statements are mailed to the account holder's proper address, the risk of nonreceipt falls on the account holder and interception of the state-

ments by a wrongdoer does not relieve the account holder of the duty to examine the statements and report unauthorized items to the bank.[1] The California Court of Appeals summarized this majority view in *Kiernan v. Union Bank*, 55 Cal.App.3d 111, 127 Cal. Rptr. 441 (1976):

> Appellants also argue that the period of limitations does not begin to run until the time a bank's customer actually receives the statement of account. It is claimed that although appellants' statements were intercepted by their own agent, there is a question of fact concerning whether respondent knew or should have known that appellants' dishonest employee was withholding from appellants the information contained in the bank statements. But [UCC section 4–406] explicitly excludes such a theory; it provides that limitation begins to run from the time a bank makes available to its customer a statement of account accompanied by the items paid. The statement of account is made available whenever the bank (1) sends or mails the statement to the customer * * *.

*Id.* at 115, 127 Cal.Rptr. at 444.

The rationale for placing the risk of nonreceipt of the bank statements on the account holder is sound:

> [A]lthough the depositor [is] not better able than the bank to discover isolated forgeries, he [is] in a better position to uncover a pattern of forgery by a trusted employee, friend or relative * * *. To discharge [the duty imposed by section 4–406 to examine the bank statements] a depositor must necessarily obtain possession of the bank statements and scrutinize

them or bear the losses which flow from his unreasonable lack of concern.

*Mesnick v. Hempstead Bank*, 106 Misc.2d 624, 625–626, 434 N.Y.S.2d 579, 580 (N.Y.Sup.Ct.1980). Furthermore, allowing account holders to avoid their duty to inspect their account statements by denying receipt of the account statements would place unreasonable financial burdens on banks and other financial institutions by forcing them to prove receipt either through the use of certified mail or by individually contacting each account holder to confirm that they had, in fact, received their account statement. Such measures would often be prohibitively expensive, especially for nonprofit, member owned credit unions. Given that the statutory duty to make a reasonably prompt examination of the statements commences upon the mailing of the statements, an agreement as to the length of time an account holder has to inspect the items cannot be said to be manifestly unreasonable because it also frames the account holder's duty in relation to when the statements are mailed. We therefore disagree with the lower courts and conclude that the Draft Withdrawal Agreement commencing the account statement inspection time upon mailing of the statement was not manifestly unreasonable.

We turn next to whether the Draft Withdrawal Agreement unreasonably attempts to eliminate the Credit Union's duty to act in good faith and with ordinary care or whether the twenty-day time period constitutes an unreasonably short time period within which the account holder must examine the statements and notify the bank of unauthorized items.

1. See *Cooley v. First Nat'l Bank of Little Rock*, 276 Ark. 387, 389, 635 S.W.2d 250, 252 (1982) ("Where bank statements are mailed to the address provided by the depositors * * * they are 'available' within the meaning of Ark.Stat.Ann. § 85–4–406."); *Decatur Fed. Sav. & Loan Ass'n v. Litsky*, 207 Ga.App. 752, 754, 429 S.E.2d 300, 303 (1993) ("[The banks's] sending, not the customer's receiving, is what governs because this is the plain word used in the statute."); *Basterrechea Distrib., Inc. v. Idaho State Bank*, 122 Idaho 572, 836 P.2d 518 (1992) (holding that interception of bank statements by dishonest bookkeeper did not excuse account holder's failure to promptly examine them); *Knight Communications, Inc. v. Boatmen's Nat. Bank*, 805 S.W.2d 199 (Mo.Ct.App.1991) (holding that account holders' duty to bring unauthorized checks to the bank's attention commences when each bank statement is mailed notwithstanding fact that dishonest business partner, rather than the account holders, received the statements); *Mesnick v. Hempstead Bank*, 106 Misc.2d 624, 434 N.Y.S.2d 579 (N.Y.Sup.Ct.1980) (stating fact that account holder's husband intercepted her bank statements would not prevent bank from invoking UCC § 4–406); *Terry v. Puget Sound Nat'l Bank*, 80 Wash.2d 157, 492 P.2d 534 (1972) (holding that an account holder's failure to investigate nonreceipt of monthly statements constitutes a lack of due care under UCC § 4–406).

In *Brunswick Corp. v. Northwestern Nat. Bank & Trust Co.*, 214 Minn. 370, 8 N.W.2d 333 (1943), this court considered the validity of a banking agreement that provided the bank would not be liable for payment of any unauthorized items if the depositor failed to notify the bank of discrepancies in his monthly bank statement within fifteen days of the mailing of the statement or ten days of the receipt of the statement by the depositor. *Id.* at 371, 8 N.W.2d at 334. We upheld the reasonableness of the restrictive provisions in a factual circumstance where the bank customer's bookkeeper intercepted the plaintiff's account statements as a part of his forgery scheme, making it highly unlikely the customer would have discovered the forgery within the restricted period of inspection provided in the agreement. Nonetheless, we stated:

> We are not unmindful of the authorities * * * which deem such provisions to be "traps for the unwary." This court is, however, committed to the view that reasonable provisions in a passbook are binding upon the depositor. We believe that the weight of reason and authority supports our view. In order that such passbook provisions have the force and effect of contract, it is necessary only that enforcement of them as such be reasonable under the circumstances.

2. The Minnesota version of the UCC was amended in 1990. Both § 336.4–103 and § 336.4–406 were amended to conform with current UCC drafting procedures using letters rather than numbers to indicate subsections. No substantive changes were made to § 336.4–103 but the wording of § 336.4–406 was changed somewhat. While new UCC Comments accompany the amended statutes, no new Minnesota Commercial Code Comments were included.

3. The comments state: "Minnesota has recognized that a shorter period set by agreement for the time in which a customer is to examine his bank statements controls over the longer limit set by statute" and, so long as it did not relieve the bank of its duties of good faith and ordinary care, an agreement of the type at issue in *Brunswick* "would probably be valid unless found to be unreasonable and oppressive." Minnesota Uniform Commercial Code Comments to Minn.Stat. §§ 336.4–103 and 336.4–406 (1966).

4. New York courts have consistently held that contractual provisions specifying the period

*Id.* at 375, 8 N.W.2d at 336 (citations omitted). Stowell argues that *Brunswick* was of little precedential value because it was decided before the enactment of the UCC and was factually distinguishable from the circumstances here because it involved the contractual provision relating to the ten-day inspection period after the receipt of the bank statements rather than the fifteen day period after the mailing of the statements. We disagree because the Comments to the original version of Minn.Stat. §§ 336.4–103 and 336.4–406 [2] cite it as an authority for recognizing the validity of agreements setting time periods for examining account statements.[3] Other UCC commentators agree that, in order to avoid controversy over whether action is "prompt" under section 4–406(c), the account holder and the bank may determine by agreement the specific number of days within which the account holder must take action. 7 Ronald A. Anderson, Uniform Commercial Code: Text, Cases, Commentary 502 (3rd ed. rev. vol. 1995); *see also* John W. Hinchey, *An Analysis of Bank Defenses to Check Forgery and Alteration Claims Under Uniform Commercial Code Articles 3 and 4: Claimants Negligence and Failure to Give Notice*, 10 Pepp.L.Rev. 1, 35 (1982) ("The Code expressly acknowledges the validity of [agreements modifying the time limits prescribed by section 4–406], the only limitation being that the bank cannot disclaim its responsibility to act in 'good faith' or with 'ordinary care.' ").[4]

within which an account holder must notify the bank of unauthorized items in the account statement are valid under UCC section 4–103(a). *See Zambia Nat'l Commercial Bank Ltd. v. Fidelity Int'l Bank*, 855 F.Supp. 1377 (S.D.N.Y.1994) (upholding, against bank, agreement giving account holder sixty days to examine statement and notify bank of unauthorized items); *Qassemzadeh v. IBM Empl. Fed. Cred. Union*, 167 A.D.2d 378, 561 N.Y.S.2d 795 (1990) (affirming summary judgment against account holder who had failed to comply with requirement of share draft agreement that account holder notify credit union of unauthorized drafts within thirty days of mailing of account statement); *N.Y. Credit Men's Adjustment Bureau, Inc. v. Manufacturers Hanover Trust Co.*, 41 A.D.2d 912, 343 N.Y.S.2d 538 (1973) (holding that thirty-day notice provision triggered by mailing of statement merely provides a condition precedent to liability, it does not attempt absolve the bank for lack of good faith or ordinary care); *J. Sussman, Inc. v. Manufacturers Hanover Trust Co.*, 2 UCC Rep. Serv.2d 1605, 1986 WL 213396 (N.Y.Sup.Ct.

Stowell asserts that the Draft Withdrawal Agreement amounts to an attempt by the Credit Union to establish an absolute twenty-day limitation on bringing suit and therefore to disclaim its duty, under Minn.Stat. § 4–406(e), to exercise ordinary care in paying items presented to it. Neither the district court nor the court of appeals addressed this issue. If, in fact, the agreement did establish an absolute bar to suit after the passage of twenty days, even for a failure to exercise ordinary care in paying the checks, it would be manifestly unreasonable. But that is not what the agreement provides—there is no language in the agreement stating that the Credit Union will not be liable for breach of its duty to exercise ordinary care. Further, § 336.4–103 specifically states that the parties to an agreement *"cannot* disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care * * *." Minn.Stat. § 336.4–103(a) (emphasis added). Cases interpreting very similar agreements have held that "the fact that the resolution merely sets forth a condition precedent to liability does not * * * disclaim the bank's responsibility for its own lack of good faith or failure to exercise ordinary care." *J. Sussman, Inc. v. Manufacturers Hanover Trust Co.,* 2 UCC Rep. Serv.2d 1605, 1608, 1986 WL 213396 (N.Y.Sup.Ct.1986); *see also P.T.A., Pub. Sch. 72 v. Manufacturers Hanover Trust Co.,* 138 Misc.2d 289, 294, 524 N.Y.S.2d 336, 340 (N.Y.City Civ.Ct.1988) (holding that agreement does not constitute an unlawful disclaimer of the bank's liability because "[t]he subparagraphs do not absolve the bank of its duty to use good faith and ordinary care."); *N.Y. Credit Men's Adjustment Bureau, Inc. v. Manufacturers Hanover Trust Co.,* 41 A.D.2d 912, 913, 343 N.Y.S.2d 538, 540 (1973) ("the agreement here does not absolve the bank for its negligence or lack of good faith or ordinary care.").

We also find unpersuasive Stowell's claim that, in this modern age of extended travel,

twenty days is simply an unreasonably short period to which to limit an account holder's opportunity to discover and report unauthorized items in the account statements. In *Brunswick,* 214 Minn. at 375, 8 N.W.2d at 336, this court upheld a fifteen-day notice provision as "reasonable under the circumstances" and several post-UCC cases have held contractual provisions establishing notification periods shorter than twenty days to be valid. *See J. Sussman,* 2 UCC Rep. Serv.2d at 1608, 1986 WL 213396 (14 days); *P.T.A.,* 138 Misc.2d at 295, 524 N.Y.S.2d 336 (14 days).

Finally, we turn to whether there was sufficient evidence to support the jury's determination that the Credit Union failed to exercise ordinary care in paying the checks forged in August 1993. Minn.Stat. § 336.4–406(e) provides:

> If subsection (d) applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to the loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with subsection (c) and the failure of the bank to exercise ordinary care contributed to the loss.

In Minn.Stat. § 336.3–103(a)(7), "ordinary care" is defined in terms of reasonable commercial practice:

> *"Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged.* In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to

---

1986) (upholding fourteen-day notice provision triggered by mailing of statement); *P.T.A., Pub. Sch. 72 v. Manufacturers Hanover Trust Co.,* 138 Misc.2d 289, 524 N.Y.S.2d 336 (N.Y.City Civ.Ct. 1988) (holding that account agreement which provided that a trust company was not liable for any payments erroneously charged to an account

unless the account holder notified the trust company of the error within fourteen days of the delivery or mailing of the account statement constituted a valid condition precedent to suit because the terms were not unconscionable, manifestly unreasonable, or the product of overreaching).

examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this article or article 4.

(emphasis added); *see also* Minn.Stat. § 336.4–104(c) (making Article 3 definition of ordinary care applicable to Article 4). Thus, the UCC establishes a "professional negligence" standard of care which focuses on the procedures utilized in the banking industry rather than what a reasonable person would have done under the same or similar circumstances. *See Story Road Flea Market v. Wells Fargo Bank,* 42 Cal.App.4th 1733, 50 Cal.Rptr.2d 524, 528 (1996).

Stowell's evidence on this issue was that Stowell contacted Credit Union Vice President Terrance Kimber in August 1993 and told him that he had not been receiving any mail from the Credit Union. Stowell argues that his conversations with Kimber regarding his lack of receipt of his account statements should have been sufficient to give the Credit Union notice of a problem and should have prompted the Credit Union to take some protective action. The Credit Union, on the other hand, provided testimony of its compliance with the standards of the banking industry through an expert witness who testified that the Credit Union's automated check processing procedures were the same as those used by all the banks and credit unions in Minnesota. The Credit Union is required to honor all checks presented for payment from the accounts of its members unless it receives a stop payment order from the account holder or there are insufficient funds in the account to cover the check. Stowell's failure to present any evidence that the Credit Union's course of conduct somehow fell short of the reasonable commercial standards defining ordinary care in section 336.3–103(a)(7) is fatal to his claims as to the August forgeries, and in this evidentiary void, we conclude the jury could not reasonably have found that the Credit Union did not meet the statutory definition of "ordinary care." We therefore reverse the order of the district court requiring the Credit Union to bear seventy-five percent of the loss for the checks forged in August 1993.

 The Credit Union recovered $4,388.27 of the forged items from banks that had cashed those checks but, apparently because of this impending litigation, the Credit Union did not return the recovered funds to Stowell's account. Under the equitable principle of unjust enrichment, the Credit Union should not be entitled to retain these funds because they originated from Stowell's account. We therefore direct the district court to enter judgment in favor of Stowell in the amount of $4,388.27, plus interest.

Reversed and remanded with instructions.

BLATZ, J., took no part.