Winston D. PETERS, Appellant

v.

RIGGS NATIONAL BANK, N.A., Appellee.

No. 05–CV–1379.

District of Columbia Court of Appeals.

Argued Dec. 6, 2007.

Decided Feb. 28, 2008.

Gene C. Lange, Washington, DC, for appellant.

Daniel S. Fiore, Arlington, VA, for appellee.

Before WASHINGTON, Chief Judge, and GLICKMAN and KRAMER, Associate Judges.

WASHINGTON, Chief Judge:

Appellant Winston D. Peters, the personal representative of the Estate of Rhona Graves, appeals from the trial court's grant of summary judgment against his claims of breach of contract, negligence, and violations of the Electronic Funds Transfer Act ("EFTA"). Appellant claimed that appellee Riggs Bank permitted unauthorized withdrawals in the amount of $131,278.61 from his mother's account despite the fact that she had been incapacitated and later died while most of the transactions occurred. Riggs. Bank denied liability, but further asserted that appellant's claims were untimely. We agree that appellant's claims are time-barred. Thus, we affirm.

## I.

On October 31, 1980, Rhona Graves opened a checking account at Riggs Bank. Graves entered into a customer agreement with Riggs, which included adoption of Riggs's Rules and Regulations that covered the checking account, and executed a signature card. Graves later opened a savings account with Riggs on October 3, 1986. This account was also governed by Riggs's Rules and Regulations.[1]

At some point prior to June of 2002, Ms. Graves won a substantial amount of money in the lottery. She deposited her lump sum payment into her accounts at Riggs Bank. However, on June 8, 2002, Ms. Graves suffered a serious stroke and was hospitalized. She lost the ability to communicate. She was later transferred to a nursing home where she remained in a seriously ill condition until she died on November 9, 2002.

Between May and December of 2002, someone withdrew money from Ms.

---

1. Relevant to this appeal is the following provision:

 Your statement is considered correct, and we [Riggs Bank] will not be liable for payments made and charged to your account ... unless you notify us of an error, including ... unauthorized payment or other irregularity within (a) sixty (60) calendar days ... of the mailing date of the earliest statement describing the charge or deposit to your account.

Graves's accounts through the writing of checks, phone transfers, and ATM withdrawals. Although uncertain, appellant suspects that Ms. Graves's sister, who lived with and assisted Ms. Graves for about three years between Ms. Graves's first stroke (in 2000) and her death, took the money. Appellant concedes that he does not know that his mother did not want her sister to have access to the funds, nor can he be sure that Ms. Graves did not sign the checks. However, while Ms. Graves was in the hospital, appellant told his aunt that he would bring her money to pay the household bills. Appellant claims he told his aunt not to use money from his mother's accounts.

During the 153–day period from Ms. Graves's stroke until her death, there were 73 ATM withdrawals from her account, including 72 of them at the $500.00 daily limit for withdrawals. Then, 21 additional withdrawals were made during the 41 days after Ms. Graves died, including 19 at the $500 maximum. All together, $46,547.00 was withdrawn from the account, including $10,159.50 after her death. Also, during this time, 128 checks were written, resulting in her account being debited $84,731.61.[2] According to appellant, the signature on checks provided back to him does not match his mother's authorized signature on file with the bank. Six of the checks (totaling $62,000) were made out to his mother's sister, and another check was written to her daughter. Appellant asserts that during the time period of Ms. Graves's critical illness, she did not have the capacity to review bank statements, and that in any event, there is no evidence that she received any bank statements at the hospital.

After Ms. Graves died in November of 2002, appellant petitioned for letters of administration in January 2003 and received authority to open Ms. Graves's safety deposit box. In January 2003, appellant inspected the safety deposit box and discovered that his mother had won the lottery.[3] At that time, her accounts showed balances of $2,174.18 and $159.81. On March 10, 2003, Riggs issued a check to appellant, payable to the Estate of Rhona Graves, in the amount of $2,301.12—the remaining account balance.

Appellant tried to track down the amount and location of the proceeds of Mrs. Graves's lottery winnings. He was finally appointed personal representative of the estate on April 2, 2003. Also in April, appellant discovered a Riggs bank statement from August 13, 2002 through September 12, 2002, showing that Ms. Graves's account had held $92,187.45, but closed at the end of the period with only $58,935.98. On April 16, 2003, appellant (through counsel) wrote Riggs Bank requesting more information about Ms. Graves's account. Appellant claims he had no basis for asserting that Riggs Bank had done anything improper at that time. On May 28, 2003, Riggs responded by providing appellant's counsel with copies of some account statements and other records and informed him that Riggs was still in the process of gathering further information. Riggs provided more documents on June 4, 2003.[4]

---

2. Appellant, however, conceded that some of the payments made went to pay off valid debts of his mother. Further, he conceded that he could not be certain that, at least in regard to some transactions, the payments were unauthorized.

3. Appellant also discovered a will, which appointed him executor of the estate and listed him and his brother (and not his mother's sister) as beneficiaries.

4. Appellant's brief states that Riggs sent documents on June 4, *2004*. Given the chronology, it is likely he meant June 4, 2003.

Appellant apparently believed Riggs was investigating the withdrawals up until a November 12, 2003 meeting. By that point, Riggs had not provided results of an investigation. On November 7, 2003, appellant (through counsel) indicated to Riggs Bank that Riggs may have improperly permitted the payment on unauthorized checks and allowed unauthorized ATM cash withdrawals, but stated that appellant was awaiting the results of Riggs Bank's investigation before asserting a formal claim. According to appellant, Riggs failed to provide any further information. On August 4, 2004, appellant filed a complaint with the Superior Court, alleging breach of contract, negligence, and violations of EFTA. Appellee moved for summary judgment against appellant, claiming that appellant's claims were time-barred, as well as asserting that appellant had conceded that he could not say for certain that the checks and withdrawals had been unauthorized.

On Friday, October 14, 2005, the Honorable Michael L. Rankin held a hearing on the summary judgment motion. At the hearing, Judge Rankin, in the absence of evidence to the contrary, accepted the representations of Riggs Bank that it had sent monthly account statements to Ms. Graves, and that neither she nor appellant had notified the Bank of any unauthorized transactions in a timely manner. Judge Rankin ruled:

> In my view the defendant has the better of this argument and that it would be against the Uniform Commercial Code as applied in this case to hold the bank responsible for the loss of this money when they were sending notices of the monthly transactions, as they were re-

quired to do under their contract, to the only address that they had.

> In light of my view that that is the correct application of the law in this case, I'm going to enter summary judgment in favor of the defendant.

The court subsequently issued a one-page order, granting defendant's motion for summary judgment on all claims. This appeal followed.

## II.

Summary judgment is appropriate if, when viewing the record in the light most favorable to the non-moving party, there are no genuine issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. Super. Ct. Civ. R. 56(c); *see also Abdullah v. Roach,* 668 A.2d 801, 804 (D.C.1995). In reviewing summary judgment decisions, we conduct an independent review of the record and apply the same standard as the trial court in considering whether the motion was properly granted. *See Burt v. First Am. Bank,* 490 A.2d 182, 184–85 (D.C. 1985).

### A. Unauthorized Checks.

 Articles 3 and 4 of D.C. Code, Commercial Law and Transactions ("U.C.C.") apply to negotiable instruments, including checks. *See* D.C.Code § 28:3–102(a) (2001); D.C.Code § 28:3–104 (2001). Thus, the U.C.C. governs the disposition of the unauthorized checks in this case. Under the U.C.C., a person is not liable for a negotiable instrument unless he or she signed it. *See* D.C.Code § 28:3–401 (2001). However, D.C.Code § 28:4–406 imposes upon bank customers a duty to discover and report unauthorized signatures or alterations to the bank.[5]

---

5. The rationale for this U.C.C. provision is to allocate the burden of discovering forgeries to the party best able to detect the forgery: customers are more familiar with their own signatures and transactions than a financial institution that may process thousands of

D.C.Code § 28:4–406(f) establishes an absolute notice requirement for customers as a pre-requisite to bringing any claim against the bank:

> Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (subsection (a) of this section) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration. If there is a preclusion under this subsection, the payor bank may not recover for breach of warranty under section 28:4–208 with respect to the unauthorized signature or alteration to which the preclusion applies.

D.C.Code § 28:4–406(f).[6]

Other jurisdictions have consistently characterized this U.C.C. provision as a statute of repose, as opposed to a statute of limitations. *See Jensen v. Essexbank,* 396 Mass. 65, 483 N.E.2d 821, 822 (1985) ("The one-year period in § 4–406(4) [precursor to 4–406(f)] is not a statute of limitations.... It is a statutory prerequisite of notice"); *Indiana Nat'l Corp. v. FACO, Inc.,* 400 N.E.2d 202, 205 (Ind.Ct.App. 1980) (calling the provision "substantive law"). Other courts have noted that the provision constitutes a condition precedent to the customer's right to file claims against a bank. *See National Title Insur. Corp. Agency v. First Union Nat'l Bank,*

263 Va. 355, 559 S.E.2d 668, 671 (2002). According to this court, "[a] statute of repose ... establishes an absolute time period within which legal proceedings must be initiated, regardless of when a cause of action accrues." *Sandoe v. Lefta Assoc.,* 559 A.2d 732, 736 n. 5 (D.C.1989). Based on the clear statutory language of D.C.Code § 28:4–406(f)—"[A] customer who does not ... discover and report ... is precluded from asserting against the bank the unauthorized signature or alteration"—we hold that D.C.Code § 28:4–406(f) is a statute of repose.

■ We must next determine whether Riggs Bank permissibly shortened the length of the statute of repose from D.C.Code § 28:4–406(f)'s provision of one-year to a period of sixty days. The U.C.C. establishes that contracting parties may vary U.C.C. terms by contract:

> The effect of the provisions of this article may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

D.C.Code § 28:4–103(a) (2001). Further, this court has noted that " '[t]he relationship between a bank and a depositor is a contractual relationship that is governed

---

transactions. *See American Airlines Employees Fed. Credit Union v. Martin,* 29 S.W.3d 86, 92 (Tex.2000).

**6.** With respect to the one year statute of repose in § 28:4–406(f), the period precluding claims for all fraudulent checks written by the same wrongdoer begins to run from the date of the first fraudulent check, rather than a separate period of repose for each fraudulent check. *See* D.C.Code § 28:4–406, cmt. 2 (for

Section 28:4–406(d)(2)) ("If the payment of subsequent items occurred after the customer had a reasonable time (not exceeding 30 days) to report with respect to the first item and before the bank received notice of the unauthorized signature [ ] of the first item, the customer is precluded from asserting the alteration or unauthorized signature with respect to the subsequent items.").

by the written agreement between the parties.'" *Geiger v. Crestar Bank,* 778 A.2d 1085, 1090 (D.C.2001) (quoting *Isaac v. First Nat'l Bank of Maryland, D.C.,* 647 A.2d 1159, 1161 (D.C.1994)). Here, Riggs Bank and Ms. Graves entered into a contractual agreement providing, *inter alia:*

> Your statement is considered correct, and we [Riggs Bank] will not be liable for payments made and charged to your account ... unless you notify us of an error, including ... unauthorized payment or other irregularity within (a) sixty (60) calendar days ... of the mailing date of the earliest statement describing the charge or deposit to your account.

Thus, following the terms of the contract, Ms. Graves had sixty days from the mailing of her account statements to discover and report unauthorized transactions.

Appellant contends that Riggs's shortening of the period to sixty days is invalid as it provides too short a period of time for a person to discover and report problems in their account, or alternatively, it effectively excuses the bank from exercising due care. However, a review of other jurisdictions reveals that courts have consistently upheld the contractual shortening of the notice provision to periods of sixty days or shorter. *See, e.g., National Title Ins. Corp. Agency, supra,* 559 S.E.2d at 672 (upholding a sixty day notice provision); *American Airlines Employees Fed. Credit Union, supra,* 29 S.W.3d at 96 (same); *Jamison v. First Georgia Bank,* 193 Ga. App. 219, 387 S.E.2d 375, 376–77 (1989) (same). The contractual shortening does not alter the bank's duty to exercise ordinary care or good faith; it "merely varies"

the U.C.C.'s contractual notice provision. *See National Title Ins. Corp. Agency, supra,* 559 S.E.2d at 671. Neither has appellant shown the sixty day time period to be unconscionable, as he has not demonstrated both that Ms. Graves lacked a meaningful choice in entering the contract and that the contract terms unreasonably favor Riggs Bank. *See Riggs Nat'l Bank of Washington, D.C. v. District of Columbia,* 581 A.2d 1229, 1251 (D.C.1990) (citing *Williams v. Walker–Thomas Furniture Co.,* 121 U.S.App. D.C. 315, 319, 350 F.2d 445, 449 (1965)). Because the U.C.C. provision allocates the duty of discovering forgeries or unauthorized transactions to the customer, a reasonable contraction of the discovery and notice period encourages due diligence by the customer in inspecting account statements; it also promotes the U.C.C.'s goal of finality. *See Silvia v. Indus. Nat'l Bank of Rhode Island,* 121 R.I. 810, 403 A.2d 1075, 1077 (1979) (discussing the policy underlying the U.C.C. statutory notice provision as one that promotes finality of transactions). Accordingly, we agree that contracting parties may permissibly shorten the notice period to sixty days.[7]

 Appellant, however, contends that the statutory notice provision should be tolled in this case because of Ms. Graves's incapacitation and subsequent death and because appellant did not discover the unauthorized transactions until months after his mother's death. In essence, appellant asks this court to read a discovery rule into D.C.Code § 28:4–406(f) that would permit equitable tolling of the

---

**7.** Although other courts have approved of shorter contractual notice periods, *see, e.g., Stowell v. Cloquet Co-op Credit Union,* 557 N.W.2d 567, 572 (Minn.1997) (upholding twenty day provision); *PTA, Pub. Sch. 72 v. Mfrs. Hanover Trust Co.,* 138 Misc.2d 289, 295, 524 N.Y.S.2d 336, 340 (N.Y.City-Civ.Ct.1988) (upholding fourteen day provision); *Borowski v. Firstar Bank Milwaukee, N.A.,* 217 Wis.2d 565, 579 N.W.2d 247, 252–53 (Ct.App.1998) (same), we express no opinion as to the validity of any contract shorter than sixty days.

provision. Appellant's position is untenable: equitable tolling cannot apply to statutes of repose. "Under the discovery rule, a particular cause of action accrues when the plaintiff knows or through the exercise of due diligence should have known of the injury." *Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1201 (D.C.1984) (internal quotation omitted). However, "[a] statute of repose ... establishes an absolute time period within which legal proceedings must be initiated, *regardless of when a cause of action accrues.*" *Sandoe, supra*, 559 A.2d at 736 n. 5 (emphasis added). Therefore, if a statute of repose applies regardless of when the cause of action accrues, and the discovery rule merely alters when the cause of action accrues, then the discovery rule cannot apply to a statute of repose.[8] This logic is consistent with holdings from other jurisdictions. *See, e.g., Estate of Decker v. Farm Credit Servs. of Mid–America, ACA*, 684 N.E.2d 1137, 1139 (Ind.1997) ("While equitable principles may extend the time for commencing an action under statutes of limitation, nonclaim statutes impose a condition precedent to the enforcement of a right of action and are not subject to equitable exceptions."); *Brighton, Inc. v. Colonial First Nat'l Bank*, 176 N.J.Super. 101, 422 A.2d 433, 437 (App. Div.1980) ("The one-year period limitation in § 4–406(4) is not merely a statute of limitations, but a rule of substantive law barring absolutely a customer's untimely asserted right to make such a claim against the bank.").

Courts have applied this statutory bar even in cases where the result is harsh.

In *Siecinski v. First State Bank of East Detroit*, 209 Mich.App. 459, 531 N.W.2d 768, 769 (1995), an account holder suffered a head injury, fell into a coma, and died around a month later. Prior to her death, someone presented the incapacitated woman's bank with a forged power of attorney and ultimately withdrew everything in the account (around $175,000, most of it *after* the woman had died). *Id.* The appellant in the case had been appointed personal representative and had eventually discovered the wrongful withdrawals. *Id.* The Michigan Court of Appeals concluded that its version of § 4–406(4) [the predecessor to 4–406(f) ] barred the action despite the fact that no one was in a position to discover the forgery. *See id.* at 770. The court concluded that the statutory language created an absolute bar and that actual receipt of customer bank statements was not required:

> Courts of other jurisdictions have held that the subsection is not a limitation statute subject to tolling under compelling circumstances but is a statutory prerequisite of notice that absolutely bars a customer's right to make a claim against the bank after one year without regard to the care or lack of care of either the customer or the bank.

*Id.* The court further concluded that the statutory provision barred all causes of action-thus, appellant's negligence claim failed as well. *Id.* at 770–71.

Courts have applied this reasoning against mentally incompetent plaintiffs as well. In *Brown v. Cash Mgmt. Trust of Am.*, 963 F.Supp. 504, 504–05 (D.Md.1997) (applying N.Y. law), the U.S. District

---

**8.** This reasoning is also reflected in Black's Law Dictionary: " 'statutes of limitations' extinguish, after [a] period of time, [the] right to prosecute accrued cause[s] of action; [a] 'statute of repose,' by contrast, limits potential liability by limiting [the] time during which cause of action can arise. It is distinguish-able from [a] statute of limitations, in that [a] statute of repose cuts off right of action after [a] specified time measured from delivery of product or completion of work, regardless of time of accrual of cause of action or of notice of legal rights." BLACK'S LAW DICTIONARY 1411 (6th ed. 1990).

Court in Maryland barred the plaintiff's claim in a case where a woman had opened a checking account as a co-signor with plaintiff, a mentally incompetent woman, before forging the incompetent plaintiff's signature and looting the account. Further, the bank sent statements to either the co-signor or the plaintiff's agent, but never to the plaintiff. *Id.* at 505. Nevertheless, the court held that the provision was "an unalterable condition precedent to suit" and declined to make an exception due to the plaintiff's mental state: "The certainty which the Uniform Commercial Code seeks to achieve in respect to commercial transactions would quickly dissipate if *ad hoc* exceptions to its commands were too eagerly crafted to accommodate the occasional 'hard case.'" *Id.* at 506. The North Carolina Court of Appeals reached the same conclusion. *See Union v. Branch Banking & Trust Co.,* 176 N.C.App. 711, 627 S.E.2d 276, 279 (2006) ("[F]ailure of a customer or his representative to report his unauthorized signature within one year after the bank makes account statements available precludes a claim against the bank, even if the customer is incompetent (whether adjudicated or unadjudicated) during the one-year period for providing notice.").

These principles have also been applied in a number of fraud cases where the party forging checks intercepted bank statements—thus preventing the account holder from actually receiving the statements and reporting any errors. In *Stowell v. Cloquet Co-op Credit Union,* 557 N.W.2d 567, 569–70 (Minn.1997), a man forged his neighbor's signature on fifty checks, misappropriated a total amount of $22,000, and stole his neighbor's credit union statements every month. In concluding that § 4–406(f) applied to bar the plaintiff's claims, the court explained that the U.C.C. provision assigns the risk of non-receipt to the bank customer:

The modern U.C.C. case law of other jurisdictions is virtually unanimous in holding that, once account statements are mailed to the account holder's proper address, the risk of nonreceipt falls on the account holder and interception of the statements by a wrongdoer does not relieve the account holder of the duty to examine the statements and report unauthorized items to the bank.

*Id.* at 571–72; *see also id.* at 568–69 (pointing out that the credit union processed roughly one million transactions a day, and thus provided monthly account statements, rather than manually checking individual signature cards). The court further noted that requiring actual receipt of the statements (which would be the result of placing the risk of non-receipt on the bank) "would place unreasonable financial burdens on banks and other financial institutions by forcing them to prove receipt either through the use of certified mail or by individually contacting each account holder to confirm that they had, in fact, received their account statement." *Id.* at 572. Other courts have reached the same conclusion. *See, e.g., Borowski v. Firstar Bank Milwaukee, N.A.,* 217 Wis.2d 565, 579 N.W.2d 247, 252–53 (Ct.App.1998) (concluding that notice provision still barred claims even where plaintiff's girlfriend forged checks (totaling around $150,000) and intercepted bank statements); *PTA, Pub. Sch. 72 v. Mfrs. Hanover Trust Co.,* 138 Misc.2d 289, 295, 524 N.Y.S.2d 336, 340 (N.Y.CityCiv.Ct.1988) (upholding bar of claim despite fact that forger intercepted statements, meaning that account holder had no actual receipt).

These courts based their decisions on the underlying policies of the Uniform Commercial Code: encouraging the efficiency and finality of transactions through a uniform and predictable application of the law. *See, e.g., Brown, supra,* 963

F.Supp. at 506 n. 4 ("[T]he U.C.C. has the objective of promoting certainty and predictability in commercial transactions.") (internal quotation omitted); *Fundacion Museo de Arte Contemporaneo de Caracas–Sofia Imber v. CBI–TDB Union Bancaire Privee*, 996 F.Supp. 277, 291 (S.D.N.Y.1998) (declining to impose actual receipt requirement because it would require banks to send account statements by certified mail); *Silvia, supra*, 403 A.2d at 1077 (discussing the policy underlying § 4–406(4) as one that promotes finality of transactions). According to the U.C.C. itself, U.C.C. provisions "shall be liberally construed and applied to promote its underlying purposes and policies," including a policy "to make uniform the law among the various jurisdictions." D.C.Code § 28:1–102 (2001).

Appellant urges the court to accept an exception carved out by a California appellate court. In *Mac v. Bank of Am.*, 76 Cal.App.4th 562, 567–68, 90 Cal.Rptr.2d 476 (Cal.Ct.App.1999), the court found that § 4–406(f) did not apply and did not bar the claim of a personal representative to recover for unauthorized transactions that cleared after the account holder's death because § 4–406(a) requires that statements be "made available to the customer," and in that case, there was no customer because the customer had died. We decline to adopt *Mac*; it functionally imposes a discovery rule inconsistent with the principles underlying statutes of repose, as well as the policies of uniformity and predictability espoused by the U.C.C. Its application to other cases would create the type of *ad hoc* exception that other jurisdictions have avoided. Further, it would impose upon banks the duty of ensuring actual receipt-a logistical problem whose extra costs would undoubtedly be passed on to the consumer. Therefore, consistent with other jurisdictions and in promotion of the underlying policies of the U.C.C., we hold that D.C.Code § 28:4–406(f) is not subject to equitable tolling. Because it is undisputed that neither Ms. Graves nor appellant timely notified Riggs Bank of the unauthorized transactions, appellant's claims are barred.

### B. ATM Withdrawals.

■ Appellant's claim seeking recovery for over $46,000.00 in money allegedly withdrawn without authorization from Ms. Graves's checking account through ATMs also fails. The Electronic Funds Transfer Act ("EFTA"), codified at 15 U.S.C. § 1693 *et seq.* controls this claim. EFTA creates a cause of action for consumers: "any person who fails to comply with any provision of [EFTA] with respect to any consumer ... is liable to such consumer...." 15 U.S.C. § 1693m(a). Appellant claimed that Riggs violated EFTA by refusing to refund the withdrawn funds and by its failure to provide a timely report of investigation into the withdrawals. *See* 15 U.S.C. § 1693g (a) (limiting the amount of consumer liability for unauthorized transactions); 15 U.S.C. § 1693f (EFTA's error resolution provision). However, EFTA contains a one-year statute of limitations period: "Without regard to the amount in controversy, any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m (g). Although the discovery rule could apply to this claim, the statute of limitations begins to run from the date of notice of the injury. *See Ehrenhaft, supra*, 483 A.2d at 1201 (noting that cause of action accrues when the plaintiff knew or through due diligence should have known of the injury). Appellant did not file suit until August 4, 2004. Not only did appellant fail to bring his claim within one year of the final unauthorized transaction

(December 20, 2002), he also failed to bring it within a year his appointment as the personal representative of the estate (April 2003), when he began receiving copies of his mother's account statements. Thus, even applying the discovery rule to appellant's claim for unauthorized withdrawals from the ATM's, appellant's claim must fail.[9]

Accordingly, the decision of the trial court is

*Affirmed.*

9. Similar to the notice provision for checks, EFTA excuses the Bank from liability for unauthorized withdrawals where the consumer fails to report the loss in a timely manner. *See* 15 U.S.C. § 1693g (a) ("[R]eimbursement need not be made to the consumer for losses the financial institution establishes would not have occurred but for the failure of the consumer to report within sixty days of transmittal of the statement (or in extenuating circumstances such as extended travel or hospitalization, within a reasonable time under the circumstances) any unauthorized electronic fund transfer or account error which appears on the periodic statement provided to the consumer under section 906 [15 USCS § 1693d]."). Though this notice provision includes the language regarding extenuating circumstances, this does not help appellant in this case. As noted above, the separate statute of limitations had already run and there is no such extenuating circumstances provision in § 1693m (g).